Kevin S. Webb
*kwebb@cftc.gov*
James H. Holl, III
*jholl@cftc.gov*
Gretchen L. Lowe
*glowe@cftc.gov*
Attorneys for Plaintiff
U.S. Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581
Tel. 202-418-5000

Jeannette F. Swent, Utah Bar #6043
Chief, Civil Division
*jeanette.swent@usdoj.gov*
Carlie Christensen, Utah Bar #0633
United States Attorney
*carlie.christensen@usdoj.gov*
U.S. Attorney's Office, District of Utah
185 S. State St. #300
Salt Lake City, UT  84111
Tel.  801-325-3220

FILED
U.S. DISTRICT COURT

2011 JAN 24  P 2: 31

DISTRICT OF UTAH

BY:_____
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION<br><br>Plaintiff,<br><br>v.<br><br>U.S. VENTURES LC, a Utah limited liability company, WINSOME INVESTMENT TRUST, an unincorporated Texas entity, ROBERT J. ANDRES and ROBERT L. HOLLOWAY,<br><br>Defendants. | COMPLAINT<br><br>Case: 2:11cv00099  JENKINS<br>Assigned To : ~~Campbell, Tena~~<br>Assign. Date : 1/24/2011<br>Description: US Commodity Futures Trading Commission v. US Ventures et al |

## I.     SUMMARY

1.     From at least May 2005 through at least November 2008 (the "relevant period"),
Defendants Winsome Investment Trust ("Winsome") and Robert J. Andres ("Andres"), acting
directly or through their agents, employees or officers, fraudulently solicited and accepted at
least $50.2 million from at least 243 individuals to participate in an unnamed Winsome
commodity pool, operated by Winsome and Andres, to trade commodity futures contracts
("commodity futures"), which in turn would participate in a commodity futures pool, operated by
Defendants US Ventures LC ("USV") and Robert L. Holloway ("Holloway").  USV, acting
through its agents, employees or officers, including but not limited to Holloway, and Winsome,
acting through its agents, employees or officers, including but not limited to Andres, (hereinafter
collectively referred to as "Defendants") provided false statements to participants and
misappropriated participant funds in a manner akin to a Ponzi scheme.  Defendants Andres and
Holloway also misappropriated participant funds to pay for personal expenses and to fund
unrelated business interests.

2.     In soliciting prospective pool participants, Winsome, through its agents,
employees or officers, including, but not limited to Andres, misrepresented the Winsome pool's
past track record and the rates of return that had been generated trading commodity futures on
behalf of the pool.  Winsome, through its agents, employees or officers, including but not limited
to Andres, falsely claimed that "their" trading was consistently profitable, with only one losing
day of trading commodity futures, and guaranteed the return of principal and profits.  Winsome,
through its agents, employees or officers, including but not limited to Andres, failed to disclose
to most participants that USV and its CEO, Holloway, and not Winsome or its employees or
officers, were conducting the trading on behalf of Winsome and its participants.  Winsome,

2

through its agents, employees or officers, including but not limited to Andres, also failed to adequately disclose the risks involved in trading commodity futures contracts to prospective participants.

3.     Contrary to Winsome and Andres' claims of consistently profitable trading, USV and Holloway's commodity futures trading was not successful. USV, through its agents, employees or officers, including but not limited to Holloway, did not have a successful track record prior to the relevant period and sustained overall net trading losses of approximately $10.7 million during the relevant period.

4.     Moreover, Defendants only traded a portion of the Winsome pool's funds and misappropriated the majority of participant funds to pay purported "profits" to pool participants in a manner akin to a Ponzi scheme, to fund unrelated business interests and to pay for personal expenses such as homes, cars and jewelry.

5.     To conceal USV and Holloway's trading losses and Defendants' misappropriation, Defendants fabricated, or caused to be fabricated, and provided, or caused to be provided, false statements to participants reflecting consistently profitable trading of participant funds with no losses.

6.     Some participants substantially increased their investment and/or encouraged others to invest with Winsome and Andres, based on the profits appearing in their account statements.

7.     Since at least April 2007, Winsome and Andres notified certain participants that the United States Securities and Exchange Commission ("SEC") had frozen participants' funds. Winsome and Andres did not disclose that most of the participants' funds had either been lost in trading or misappropriated. Defendants have not returned most of the participants' funds.

Winsome and Andres continued to claim that participant funds remain frozen by the SEC.

Recently, however, Andres personally contacted participants asking them to verify their

investments purportedly as part of the process to return funds to participants. In a blatant effort

to intimidate, Andres is demanding that in order to obtain repayment, participants must

acknowledge that they have not taken or assisted others in taking legal action against Winsome.

If any participants indicate they have, the return of their funds would be "handled by an

Attorney." The source of the funds purportedly available to make payment to existing

participants is unknown.

       8.     By virtue of this conduct and the further conduct described herein, Defendants

have engaged, are engaging in, or are about to engage in practices in violation of Sections

4b(a)(2)(i)-(iii) of the Commodity Exchange Act, ("CEA"), 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006),

with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A)-(C) of the CEA as

amended by the Food Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII

(the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted

June 18, 2008), with respect to acts occurring on or after June 18, 2008. Defendants also have

acted in a capacity requiring registration with the Commodity Futures Trading Commission

("CFTC" or the "Commission") without the benefit of registration in violation of Sections 4k(2)

and 4m(1) of the CEA, 7 U.S.C. §§ 4k(2) and 4m(1) (2006). Defendants failed to operate their

respective commodity pools as separate legal entities and failed in receive participant funds in

the name of the pools in violation of Commission Regulations ("Regulations") 4.20(a)(1) and

(b), 17 C.F.R. §§ 4.20(a)(1) and (b) (2010). Winsome also failed to provide required disclosure

documents, acknowledgments thereof, and failed to provide monthly account statements with the

required information in violation of Regulations 4.21 and 4.22, 17 C.F.R. §§ 4.21 and 4.22 (2010).

9.     At all relevant times, the acts and omissions of Holloway and others were committed within the scope of their employment, agency or office with USV and therefore, USV is liable for Holloway's violations as well for any other agents' violations of the CEA and Regulations, pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

10.     Holloway directly or indirectly controlled USV and its employees, officers or agents, and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting USV violations of the CEA and Regulations and is therefore liable as a controlling person pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2006) for USV's violations.

11.     At all relevant times, the acts and omissions of Andres and others were committed within the scope of their employment, agency or office with Winsome and therefore, Winsome is liable for Andres' as well as for any other agents' violations of the CEA and Regulations, pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010)

12.     Andres directly or indirectly controlled Winsome and its employees, agents or officers, and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Winsome's violations of the CEA and Regulations and is therefore liable as a controlling person pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b) (2006) for Winsome's violations.

13.     Accordingly, pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1 (2006), the Commission seeks a permanent injunction, civil monetary penalties, restitution to customers for

5

losses proximately caused by Defendants' fraud, disgorgement of Defendants' ill-gotten gains and such other ancillary relief as this Court may deem necessary or appropriate.

14.     Unless enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint, as more fully described below.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Section 6c of the CEA, 7 U.S.C. § 13a-1 (2006), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order promulgated thereunder, the Commission may bring an action against such person to enjoin such practice or to enforce compliance with the CEA.

16.     Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e) (2006), in that Defendants transact business in this District, and the acts and practices in violation of the CEA have occurred, are occurring, or are about to occur, within this District, among other places.

## III.     THE PARTIES

17.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with the administration and enforcement of the CEA, 7 U.S.C. §§ 1 *et seq.* (2006), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2010).

18.     Defendant **US Ventures LC** is a Utah limited liability company with its principal place of business at 3899 East Parkview Drive, Salt Lake City, Utah 84124.  USV is engaged in the business of soliciting individuals to participate in an unnamed commodity futures pool.  USV

operated a "fund of funds," accepting and investing funds solicited by other commodity pools (e.g., Winsome).  USV has never been registered with the Commission in any capacity.  As set forth below, USV was named as a relief defendant in an enforcement action by the SEC.

19.     Defendant **Winsome Investment Trust** is an unincorporated entity with its principal place of business at 5644 Westheimer #452, Houston, Texas 77056.  Winsome is engaged in the business of soliciting individuals to participate in an unnamed commodity futures pool.  Winsome maintains a presence on the world-wide web at www.winsometrust.com. Winsome has never been registered with the Commission in any capacity.

20.     Defendant **Robert J. Andres** resides in Houston, Texas.  He is engaged in the business of soliciting individuals to participate in a commodity futures pool.  Andres is the apparent sole manager, attorney and trustee of Winsome.  Andres has never been registered with the Commission in any capacity.

21.     Defendant **Robert L. Holloway** resides in San Diego, California.  He is engaged in the business of soliciting individuals to participate in a commodity futures pool.  Holloway is the CEO, corporate secretary, manager, managing partner, member, program manager, resident agent, 50% shareholder and trading agent of USV.  Holloway was registered with the Commission as a Commodity Trading Advisor ("CTA") from November 29, 2007 through April 4, 2009.  Holloway and USV were named as relief defendants in an enforcement action brought by the SEC, *SEC v. Novus Techs., LLC,* No. 2:07CV00235 (D. Utah filed Apr. 11, 2007).  On May 25, 2010, a final judgment by consent was entered against USV and Holloway as relief defendants and they were held, jointly and severally liable to repay $1.1 million, representing profits and expenses paid by or to Relief Defendants, together with prejudgment interest, for a total of $1,327,966.37, but payment was waived.  In the consent judgment, USV and Holloway

neither admitted nor denied the allegations of the SEC complaint, except as to jurisdiction.

Holloway had pending an application for registrations as a Commodity Trading Advisor for an

entity called Visual Reach Group and as an Associated Person, but recently withdrew them.

## IV.    FACTS

### A.    Defendants Winsome and Andres Fraudulently Solicited At Least $50.2 Million From At Least 243 Participants

22.    Since at least May 2005, Defendants Winsome and Andres, acting directly or

through their agents, employees or officers, solicited and accepted funds from individuals to

participate in an unnamed Winsome commodity futures pool that they managed.  Winsome,

through the acts of its agents, employees or officers, and Andres thereafter deposited a portion of

those pooled funds in an unnamed USV commodity futures pool managed by USV and

Holloway.

23.    Winsome and Andres solicited prospective participants directly or through their

agents, employees or officers, through meetings, telephone and electronic communications, a

website, marketing materials and third party marketers.  Andres and Winsome, through its

agents, employees or officers, including but not limited to Andres, used the mails and

instrumentalities of interstate commerce in their solicitation of prospective participants.

24.    Winsome and Andres, acting directly or through others, provided prospective

participants with a prospectus containing an overview of their "trading program" and describing

it as a "joint venture investment."  Winsome, acting through its agents, employees or officers,

and Andres did not disclose to most prospective participants that USV and Holloway, and not

Winsome, its agents, employees or officers, managed the trading of participants' funds.

25.     The prospectus states that pool funds would be traded "at the Chicago Mercantile Exchange for E-mini S&P and, potentially, at the Chicago Board of Trade for electronic 30-year bond and 10-year note futures."

26.     According to the prospectus, participation is highly regulated and adheres to strict compliance with the Chicago Mercantile Exchange ("CME") and the SEC.  Ironically, the prospectus also informs prospective participants that Winsome's activities are not regulated.

27.     The prospectus identifies Andres as the trustee of Winsome and contains Andres' resume wherein he claims to be an attorney, a Certified Public Accountant and a holder of insurance and securities licenses.

28.     The prospectus does not identify the fund's program manager, but it describes him as an experienced member of the securities industry having managed over 200+ people at a brokerage firm and having held a seat on the CME.  Holloway is the fund's program manager.

29.     The prospectus claims that the program has historical returns of 2-10% per day and that a participant may reasonably expect average daily earnings of 1% or more.  The prospectus also asserts that daily program losses are limited to 2.5% and a participant's principal risk exposure is no more than 8-13% at any given time.

30.     The prospectus further states that "'Loss' days have been historically non-existent" and the program has only experienced one day of losses (of .7088%) since its inception. The prospectus includes purported copies of existing participants' account statements reflecting consistently profitable daily returns with no losses.

31.     Andres personally solicited certain prospective participants.  In his personal solicitations, he provided information from the prospectus alleged above, including but not limited to claims of consistent profitability and average earnings of 1% per day.

32.     Andres and Winsome, acting through its employees, agents and officers, including but not limited to Andres, also provided and executed joint venture agreements with participants and instructed them to wire funds into Winsome's bank accounts. Andres controlled the Winsome bank accounts.

33.     In addition to the personal solicitations, Winsome, acting through its employees, agents and officers, including but not limited to, Andres, and Andres solicited prospective participants via third party marketers. In their solicitation and acceptance of funds from prospective participants on behalf of the unnamed Winsome pool at the direction of Winsome and Andres, the third party marketers served as agents of Winsome and Andres.

34.     Working in cooperation with, or at the direction of Winsome and Andres, third party marketers provided the prospectus and/or relayed information contained in the prospectus to prospective participants, including but not limited to, the fund's consistently successful trading history.

35.     Winsome and Andres' third party marketers often claimed to have long-standing personal and business relationships with Winsome and Andres. They also claimed to have invested their own funds with Winsome and Andres and achieved such great returns that they invested more funds. For instance, two third party marketers claimed to have known Andres for 15 years and had invested an additional $400,000 with him after seeing great returns on their initial $100,000 investment.

36.     Contrary to the claims of Winsome and Andres, and their third party marketers, USV and Holloway's trading of commodity futures before and during the relevant period did not result in consistent daily profits. Indeed, USV and Holloway's profitable trading was a rarity.

From February 2005 through March 2007, USV and Holloway's trading resulted in an overall net loss of approximately $10.7 million.

37.     In their solicitations of prospective participants, Winsome, acting through its agents, employees or officers, including but not limited to Andres and the third party marketers, did not provide prospective participants with a Disclosure Document containing the information required by Regulations 4.24 and 4.25, 17 C.F.R §§ 4.24 and 4.25 (2008).  Further, Winsome, Andres and their third party marketers never obtained signed and dated acknowledgements from participants stating that they had received a Disclosure Document.

38.     Relying upon the prospectus and receiving affirmations of the prospectus' claims from Winsome, acting through its agents, employees or officers, Andres and/or their third party marketers, many prospective participants committed to investing in the Winsome commodity pool.  Some participants decided to invest with Winsome and Andres after seeing the purported profits earned by friends and relatives from Winsome and Andres' purportedly successful trading activities.  Most participants understood that their money was being pooled to trade commodity futures.

39.     Winsome, acting through its agents, officers or employees, including but not limited to Andres and their third party marketers, directed participants to wire funds directly to a bank account held by Winsome.

40.     Winsome, acting through its agents, officers or employees, including but not limited to Andres and their third party marketers, also required participants to sign an "agreement."  The standard agreement provided for the distribution of net proceeds to the participant, Winsome, the third party marketer, and occasionally, a purported "charity."  The standard agreement also provided for the return of a participant's principal investment at the

11

conclusion of the investment's duration, or upon fifteen days notice following the thirteenth week of the investment's duration.

41.     As a result of Winsome and Andres' fraudulent solicitations, from at least May 2005 to November 2008, at least 243 individuals forwarded at least $50.2 million to Winsome's bank account for the purpose of trading commodity futures via the unnamed Winsome commodity pool.  Winsome owned or controlled bank accounts were the largest source of funds for the USV pool.

42.     In deciding to invest with Winsome and Andres, participants relied upon Winsome and Andres' material misrepresentations and omissions concerning their alleged past trading success, the purported returns of the unnamed Winsome commodity pool identified in the prospectus and false account statements distributed to existing participants and Winsome and Andres' misleading minimization of the risks associated with trading commodity futures.

43.     Andres and Winsome, through the acts and omissions of Andres and others, knowingly or recklessly made the material misrepresentations and omitted material facts alleged above to induce individuals to invest with them.

**B.     USV and Holloway's Trading Resulted in Net Losses of Approximately $10.7 Million**

44.     Since at least February 2005, Holloway and USV, acting through its agents, employees or officers, including but not limited to Holloway, opened and maintained nine commodity futures trading accounts in the name of USV with three Futures Commission Merchants ("FCM").

45.     Holloway had trading authority over all of the USV commodity futures trading accounts.

46.     USV and Holloway operated the unnamed USV pool as a "fund of funds",

soliciting and accepting funds from other commodity pools as well as from individual participants. Holloway and USV, through its agents, employees or officers, including but not limited to Holloway, solicited individuals to invest in commodity futures on behalf of the unnamed USV pool.

47. Despite Winsome and Andres' claims of past trading success prior to the relevant period, from February 2005 through April 2005, USV and Holloway sustained trading losses of approximately $211,949 on the approximately $272,500 that was deposited in USV commodity trading accounts in that time period.

48. During the relevant time period, Andres and Winsome, through its agents, employees or officers, including but not limited to Andres, transferred approximately $24.8 million of Winsome participant funds into USV bank accounts for the purpose of trading commodity futures. Holloway and USV through its agents, employees or officers, including but not limited to Holloway, pooled those funds with approximately $4.5 million they received from other participants in the unnamed USV commodity pool. Overall, USV and Holloway received approximately $29.3 million from participants in the unnamed USV pool for the purpose of trading commodity futures.

49. Throughout the relevant period (May 2005 through November 2008) USV and Holloway deposited approximately $26.4 million in the USV commodity futures trading accounts and withdrew approximately $15.7 million from the accounts. USV and Holloway's trading in the accounts during the relevant period sustained overall net trading losses of approximately $10.7 million.

### C. Defendants Generated False Statements to Conceal Their Trading Losses

50. Defendants, acting directly or through their agents, employees or officers,

sporadically provided account statements to participants.

51.     Defendants posted a participant's daily beginning balance, earnings, additions, distributions, ending balance, return and average return in their individual account statements. Defendants did not post any fees or commissions that they charged participants in their statements.

52.     Defendants posted consistently positive returns in participants' account statements. The statements reflected virtually no losses resulting from the trading of participant funds. Defendants posted daily average returns in the statements between approximately .2729% and .85%.

53.     In reality, USV and Holloway's trading of participant funds in commodity futures resulted in significant losses. Indeed, there was a vast disparity between the profits that Defendants posted in participant account statements and the losses sustained by the USV commodity futures trading accounts. For example, despite USV having sustained approximately $10.7 million in overall net trading losses during the relevant period, Defendants' postings in participants' account statements reflected consistently profitable daily returns up to 1.6613% with virtually no losses during that time period.

54.     To shield their losses and misappropriation from discovery and prolong their successful fraudulent solicitation of funds from prospective and existing participants, Defendants, developed and implemented an elaborate Ponzi scheme whereby they would use participant funds to pay purported "profits" to participants.

55.     As part of their Ponzi scheme, Andres and Holloway directed USV employees to falsify participant records, including participant account statements, to reflect USV and Holloway's receipt and profitable trading of participants' funds, when in actuality, Winsome and

14

Andres returned participants' funds to participants as purported profits from USV and Holloway's trading.

56.     On several occasions, Holloway directed USV employees to use his "guesstimated" trading results for participant account statements.

57.     Defendants' posting of false profitable returns caused existing participants to retain their funds with Winsome and Andres, to invest additional funds with Winsome and Andres and to persuade others to invest with Winsome and Andres. For example, after making an initial investment of $100,000 in September 2006 and receiving account summaries showing consistent profitable returns, one participant invested an additional $350,000 with Winsome and Andres.

58.     Holloway and Andres, and Winsome and USV, acting through Andres, Holloway, and others respectively, knowingly or recklessly issued or caused to be issued the false statements to participants concerning the profitability of USV and Holloway's trading on their behalf.

**D.     Defendants Misappropriated Participant Funds to Conceal Trading Losses and for Personal Use**

59.     Defendants, through the acts and omissions of Holloway and Andres, misappropriated participant funds to make payments to participants as purported "profit" from USV and Holloway's trading in a manner akin to a Ponzi scheme. Andres and Holloway also misappropriated funds to pay for personal expenses and to fund unrelated business interests.

60.     As part of Defendants' elaborate Ponzi scheme, Winsome, through its agents, employees or officers, including but not limited to Andres, returned approximately $38.2 million of participant funds back to participants as purported "profits" from USV and Holloway's trading.

15

61.     Defendants Holloway and Andres also used participant funds to pay personal and unrelated business expenses.  Holloway used participant funds to pay for houses, cars, home furnishings, jewelry, lawn service, maid service and his wife's American Express credit card bills.  Holloway also used participant funds to finance his wife's, Lorraine Holloway's, eBay business: Alcoy Enterprise, LLC.  Andres used participant funds to provide money to Andres' wife and invest in various unrelated businesses, including but not limited to using $4.2 million of participant funds to purchase an aerospace consulting business.

62.     Holloway, his wife, a former USV partner, and one of his USV employees were signatories on the USV banking accounts.  Holloway maintained control over all but one of the bank accounts and over other signatories' use of the accounts.

63.     Since at least April 2007, Winsome and Andres notified certain participants that the SEC had frozen participants' funds.  Winsome and Andres informed participants that they were securing loans to return funds to them.

64.     Commencing in April 2007 and continuing to the present, participants have demanded the return of some or all of their funds invested with Winsome and Andres.  Most participants have not been able to access their funds.  Winsome and Andres continue to claim that participant funds remain frozen by the SEC.

65.     Despite the SEC action, Andres and Winsome still have not disclosed that only a portion of participants' funds had been sent to USV and Holloway for trading and have not accounted for the handling and disposition of the other funds.

66.     Recently, Andres personally contacted participants asking them to verify their investments purportedly as part of the process to return funds to participants.  In a blatant effort to intimidate, Andres is demanding that in order to obtain repayment, participants must

16

acknowledge that they have not taken or assisted others in taking legal action against Winsome. If any participants indicate they have, the return of their funds would "handled by an Attorney." The source of the funds purportedly available to make payment to existing participants is unknown.

### E.   Holloway Controlled USV and Was Its Agent

67.   Holloway acted as the CEO, corporate secretary, manager, managing partner, member, program manager, resident agent, 50% shareholder and trading agent of USV.  He held himself out as the CEO of USV at all relevant times including but not limited to when he opened and maintained commodity futures trading accounts with FCMs on behalf of USV.

68.   As the CEO, corporate secretary, manager, managing partner, member, program manager, resident agent and trading agent of USV, Holloway exercised control over its day-to-day business operations.  He managed the trading of participant funds in the unnamed USV commodity pool, and he was responsible for the content of the account statements distributed to participants.  Holloway also monitored USV employees' substantive communications with participants.

### F.   Andres Controlled Winsome and Was Its Agent

69.   Andres acted as the apparent sole manager, attorney and trustee of Winsome.  He held himself out as the attorney and trustee of Winsome at all relevant times including but not limited to when he solicited and accepted funds for investment with Winsome.

70.   As the apparent sole manager and trustee of Winsome, Andres exercised control over its day-to-day business operations.  He entered into Agreements on behalf of Winsome, directed the wire transfer of customer money into Winsome's bank accounts, directed others' solicitation of prospective participants and was responsible for the content of the account

statements distributed to participants.

## V.  VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT ONE

**VIOLATIONS OF SECTIONS 4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006) WITH RESPECT TO ACTS OCCURRING BEFORE JUNE 18, 2008, and SECTIONS 4b(a)(1)(A) and (C) OF THE CEA AS AMENDED BY THE CRA, TO BE CODIFIED AT 7 U.S.C. §§ 6b(a)(1)(A) and (C), WITH RESPECT TO ACTS OCCURRING ON OR AFTER JUNE 18, 2008:  FRAUD BY FRAUDULENT SOLICITATION**

71.     The allegations set forth in paragraphs 1 through 70 are re-alleged and incorporated herein by reference.

72.     During the relevant period, Winsome, through the acts and omissions of Andres and others, and Andres (i) cheated or defrauded or attempted to cheat or defraud other persons, and/or (iii) willfully deceived or attempted to deceive other persons, in or in connection with orders to make, or the making of, contracts of sale of commodities for future delivery, made, or to be made, for or on behalf of any other persons, where such contracts for future delivery were or could be used for the purposes set forth in Section 4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008.

73.     By knowingly making material misrepresentations and omissions concerning, but not limited to, USV's and Holloway's lack of success trading commodity futures, the operation of a Ponzi scheme and the misappropriation of funds, guaranteed profits and the risks involved in trading commodity futures, Winsome, through the acts and omissions of Andres and others, and Andres violated Sections 4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and

(iii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and

(C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with

respect to acts occurring on or after June 18, 2008.

74.     The foregoing fraudulent acts, misrepresentations, omissions and failures of

Andres and others occurred within the scope of their employment, agency or office with

Winsome.  Winsome is therefore liable for Andres' and other agents' violations of Sections

4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts

occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended by the

CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after

June 18, 2008, pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation

1.2, 17 C.F.R. § 1.2.

75.     Andres, directly or indirectly, controlled Winsome and did not act in good faith,

or knowingly induced, directly or indirectly, the acts constituting Winsome's violations of

Sections 4b(a)(1)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(1)(i) and (iii) (2006), with respect to

acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended

by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on

or after June 18, 2008.  Andres is therefore liable for these violations pursuant to Section 13(b)

of the CEA, 17 U.S.C. § 13c(b).

76.     Each act of fraudulent solicitation during the relevant period, including but not

limited to those specifically alleged herein, is alleged as a separate and distinct violation of

Sections 4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to

acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended

by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008.

## COUNT TWO

**VIOLATIONS OF SECTIONS 4b(a)(2)(i) and (iii) OF THE CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006) WITH RESPECT TO ACTS OCCURRING BEFORE JUNE 18, 2008, and SECTIONS 4b(a)(1)(A) and (C) OF THE CEA AS AMENDED BY THE CRA, TO BE CODIFIED AT 7 U.S.C. §§ 6b(a)(1)(A) and (C), WITH RESPECT TO ACTS OCCURRING ON OR AFTER JUNE 18, 2008: FRAUD BY MISAPPROPRIATION**

77.     The allegations set forth in paragraphs 1 through 76 are re-alleged and incorporated herein by reference.

78.     By using funds solicited to trade commodity futures for personal expenses, to fund unrelated business interests and to pay purported "profits" to participants in a manner akin to a Ponzi scheme, Defendants Andres, Holloway, Winsome thorough the acts of Andres, and USV, through the acts of Holloway, knowingly misappropriated funds in violation of Sections 4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008.

79.     The foregoing acts of misappropriation by Holloway occurred within the scope of his employment, agency or office with USV.  USV is therefore liable for Holloway's violations of Sections 4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008 pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

80.     Holloway, directly or indirectly, controlled USV and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting USV's violations of Sections 4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008.  Holloway is therefore liable for these violations pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

81.     The foregoing misappropriation by Andres occurred within the scope of his employment, agency or office with Winsome.  Winsome is therefore liable for Andres' violations of Sections 4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008 pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

82.     Andres, directly or indirectly, controlled Winsome and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Winsome's violations of Sections 4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after June 18, 2008.  Andres is therefore liable for these violations pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

83.     Each act of misappropriation during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections

4b(a)(2)(i) and (iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006), with respect to acts

occurring before June 18, 2008, and Sections 4b(a)(1)(A) and (C) of the CEA as amended by the

CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A) and (C), with respect to acts occurring on or after

June 18, 2008.

### COUNT THREE

**VIOLATION OF SECTION 4b(a)(2)(ii) OF THE CEA, 7 U.S.C. §§ 6b(a)(2)(ii) (2006)
WITH RESPECT TO ACTS OCCURRING BEFORE JUNE 18, 2008, and SECTIONS
4b(a)(1)(B) OF THE CEA AS AMENDED BY THE CRA, TO BE CODIFIED AT 7 U.S.C.
§§ 6b(a)(B), WITH RESPECT TO ACTS OCCURRING ON OR AFTER JUNE 18, 2008:
FRAUD BY FALSE STATEMENTS**

84.    The allegations contained in paragraphs 1 through 83 above are re-alleged and

incorporated herein by reference.

85.    By willfully making, or causing to be made, false statements to participants in the

form of account statements and oral and written communications that reported inaccurate

account balances and profitable commodity futures trading, when actual account balances did not

reflect Defendants' misappropriation of participant funds and substantial trading losses,

Winsome, through the acts of Andres and others, USV, through the acts of Holloway and others,

Andres and Holloway violated Section 4b(a)(2)(ii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(ii) (2006),

with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(B) of the CEA as

amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(B), with respect to acts occurring on

or after June 18, 2008.

86.    The foregoing fraud by false statements by Holloway occurred within the scope of

his employment, agency or office with USV.  USV is therefore liable for Holloway's violations

of 4b(a)(2)(ii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(ii) (2006), with respect to acts occurring before

June 18, 2008, and Sections 4b(a)(1)(B) of the CEA as amended by the CRA, to be codified at 7

U.S.C. §§ 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008, pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B) (2006) and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

87.    Holloway, directly or indirectly, controlled USV and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting USV's violations of Sections 4b(a)(2)( ii) of the CEA, 7 U.S.C. §§ 6b(a)(2)( ii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(B) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008.  Holloway is therefore liable for these violations pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

88.    The foregoing fraud by false statements of Andres occurred within the scope of his employment, agency or office with Winsome.  Winsome is therefore liable for Andres' violations of Section 4b(a)(2)(ii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(ii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(B) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008, and Regulation 1.2, 17 C.F.R. § 1.2.

89.    Andres, directly or indirectly, controlled Winsome and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Winsome's violations of Sections 4b(a)(2)(ii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(ii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(B) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008. Winsome is therefore liable for these violations pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

90.    Each false statement issued or caused to be issued during the relevant time period,

including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(ii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(ii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(B) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(B), with respect to acts occurring on or after June 18, 2008.

## COUNT FOUR

### VIOLATION OF SECTION 4o(1) OF THE CEA: FRAUD AS A CPO and ASSOCIATED PERSON

91.     Paragraphs 1 through 90 are re-alleged and incorporated herein by reference.

92.     During the relevant period, USV and Winsome, while acting as CPOs, and Holloway and Andres, while acting as APs of USV and Winsome, respectively, violated Section 4o(1)(A) and (B) of the CEA, 7 U.S.C. § 6o(1)(A) and (B), in that they directly or indirectly employed or are employing a device, scheme, or artifice to defraud customers or prospective customers, or have engaged or are engaged in transactions, practices or a course of business which operated or operates as a fraud or deceit upon customers or prospective customers by using the mails or other means or instrumentalities of interstate commerce. Defendants' fraudulent acts consisted of, among other things, the fraudulent solicitation of participants, the misappropriation of participant funds and the production of false statements to participants as set forth above.

93.     The foregoing misappropriation, fraudulent acts, misrepresentations, omissions and failures of Holloway occurred within the scope of his employment, agency or office with USV. USV is therefore liable for his violations of Section 4o(1) of the CEA, 7 U.S.C. § 6o(1), pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

94.     Holloway, directly or indirectly, controlled USV and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting USV's violations of Section 4o(1) of the CEA, 7 U.S.C. § 6o(1).  Holloway is therefore liable for these violations pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

95.     The foregoing misappropriation, fraudulent acts, misrepresentations, omissions and failures of Andres occurred within the scope of his employment, agency or office with USV. USV is therefore liable for his violations of Section 4o(1) of the CEA occurred within the scope of his employment, agency or office with Winsome.  Winsome is therefore liable for his violations of Section 4o(1) of the CEA, 7 U.S.C. § 6o(1), pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

96.     Andres, directly or indirectly, controlled Winsome and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Winsome's violations of Section 4o(1) of the CEA, 7 U.S.C. § 6o(1).  Andres is therefore liable for these violations pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

97.     Each act of misappropriation, false statements and fraudulent solicitation made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the CEA, 7 U.S.C. § 6o(1).

## COUNT FIVE

### VIOLATIONS OF SECTIONS 4m(1) and 4k(2) OF THE CEA: FAILURE TO REGISTER AS A COMMODITY POOL OPERATOR AND ASSOCIATED PERSON

98.     The allegations set forth in paragraphs 1 through 97 are re-alleged and incorporated herein by reference.

99.     USV and Winsome have used the mails or instrumentalities of interstate commerce in or in connection with their business as CPOs while failing to register with the Commission as CPOs, in violation of Section 4m(1) of the CEA, 7 U.S.C. § 6m(1).

100.    In soliciting prospective investors to participate in the unnamed USV and Winsome pools, Holloway and Andres failed to register as APs of USV and Winsome, respectively, in violation of Sections 4k(2) of the CEA, 7 U.S.C. §§ 6k(2).

101.    The foregoing failure of Holloway to register as an AP occurred within the scope of his employment, agency or office with USV.  USV is therefore liable for his violations of Section 4k(2) of the CEA, 7 U.S.C. §§ 6k(2), pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

102.    Holloway, directly or indirectly, controlled USV and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting USV's violations of Section 4m(1) of the CEA, 7 U.S.C. § 6m(1).  Holloway is therefore liable for this violation pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

103.    The foregoing failure of Andres to register as an AP occurred within the scope of his employment, agency or office with Winsome.  Winsome is therefore liable for his violations of Section 4k(2) of the CEA, 7 U.S.C. §§ 6k(2), pursuant to Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

104.    Andres, directly or indirectly, controlled Winsome and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Winsome's violations of Section 4m(1) of the CEA, 7 U.S.C. § 6m(1).  Andres is therefore liable for this violation pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

## COUNT SIX

### VIOLATIONS OF COMMISSION REGULATION 4.20: CPO ACCEPTING POOL FUNDS OTHER THAN IN THE NAME OF THE POOL AND FAILURE TO TREAT THE POOL AS A SEPARATE LEGAL ENTITY

105.    The allegations set forth in paragraphs 1 through 104 are re-alleged and incorporated herein by reference.

106.    By accepting or depositing pool funds in bank and trading accounts held in the name of USV or Winsome, and not into accounts in the name of the unnamed pools, USV and Winsome failed to operate their pools as a legal entities separate from themselves as pool operators, in violation of Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1).

107.    By accepting pool funds in the name of USV and Winsome and not in the name of the unnamed pool, USV and Winsome, while operating as CPOs, violated Regulation 4.20(b), 17 C.F.R. § 4.20(b).

108.    Holloway, directly or indirectly, controlled USV and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting USV's violations of Regulations 4.20(a)(1) and (b), 17 C.F.R. §§ 4.20(a)(1) and (b).  Holloway is therefore liable for these violations pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

109.    Andres, directly or indirectly, controlled Winsome and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Winsome's violations of Regulations 4.20(a)(1) and (b), 17 C.F.R. §§ 4.20(a)(1) and (b).  Andres is therefore liable for these violations pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

110.    Each instance of accepting funds in the name of USV and Winsome and not in the name of the unnamed pool, during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Regulations

4.20(a)(1) and (b), 17 C.F.R. §§ 4.20(a)(1) and (b).

## COUNT SEVEN

### VIOLATIONS OF COMMISSION REGULATION 4.21:
### FAILURE TO PROVIDE POOL DISCLOSURE DOCUMENTS

111.    The allegations set forth in paragraphs 1 through 110 are re-alleged and incorporated herein by reference.

112.    Regulation 4.21(a)(1), 17 C.F.R. § 4.21(a)(1), requires that a CPO must furnish prospective participants with a disclosure document containing specific language set forth by regulation by no later than the time the CPO delivers or causes to be delivered to the prospective participant a subscription agreement for the pool.

113.    In addition, prior to accepting or receiving funds, Regulation 4.21(b), 17 C.F.R. § 4.21(b), requires a CPO to receive from participants an acknowledgment signed and dated by the participants that they received the disclosure document.

114.    Winsome failed to furnish participants with a disclosure document and failed to receive signed and dated acknowledgments from the participants stating that they received the disclosure document, in violation of Regulations 4.21(a)(1) and (b), 17 C.F.R. §§ 4.21(a)(1) and (b).

115.    Andres, directly or indirectly, controlled Winsome and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Winsome's violations of Regulations 4.21(a)(1) and (b), 17 C.F.R. §§ 4.21(a)(1) and (b). Andres is therefore liable for these violations pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

116.    Each failure of Winsome to deliver a disclosure document to a prospective participant and each failure of Winsome to receive from a prospective pool recipient an

acknowledgement of receipt of a disclosure document, is alleged as separate and distinct violations of Regulations 4.21(a)(1) and (b), 17 C.F.R. §§ 4.21(a)(1) and (b), respectively.

**COUNT EIGHT**

**VIOLATIONS OF COMMISSION REGULATION 4.22:**
**FAILURE TO PROVIDE MONTHLY ACCOUNT STATMENTS**

117.    The allegations set forth in paragraphs 1 through 116 are re-alleged and incorporated herein by reference.

118.    Regulation 4.22, 17 C.F.R. § 4.21, requires that a CPO, registered or required to be registered under the CEA, periodically distribute to each participant an Account Statement containing the information required by regulation.

119.    Winsome failed to furnish participants with required Account Statements, in violation of Regulation 4.22, 17 C.F.R. § 4.22.

120.    Andres, directly or indirectly, controlled Winsome and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Winsome's violation of Regulation 4.22, 17 C.F.R. § 4.22.  Andres is therefore liable for this violation pursuant to Section 13(b) of the CEA, 17 U.S.C. § 13c(b).

121.    Each occasion upon which Winsome failed to deliver a required Account Statement to a participant, is alleged as a separate and distinct violation of Regulation 4.22, 17 C.F.R. § 4.22.

**VI.    RELIEF REQUESTED**

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the CEA, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers enter:

a)   an order finding the Defendants violated Sections 4b(a)(2)(i)-(iii) of the CEA, 7 U.S.C. §§ 6b(a)(2)(i)-(iii) (2006), with respect to acts occurring before June 18, 2008, and Sections 4b(a)(1)(A)-(C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), with respect to acts occurring on or after June 18, 2008, and Sections 4k(2), 4m(1) and 4o(1) of the CEA, 6k(2), 6m(1) and 6o(1) (2006), and Regulations 4.20(a)(1) and (b), 4.21 and 4.22, 17 C.F.R. §§ 4.20(a)(1) and (b), 4.21 and 4.22 (2010);

b)   an order of permanent injunction enjoining Defendants and all persons insofar as they are acting in the capacity of their agents, servants, employees, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with them who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly:

1.   in conduct in violation of Sections 4b(a)(1)(A) – (C), 4k(2), 4m(1), 4o(1) of the CEA, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2), 6m(1), 6o(1), (2006), Sections 4b(1)(A)-(C) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(1)(A)-(C), Regulations 4.20(a)(1) and (b), 4.21(a)(1) and (b) and 4.22, 17 C.F.R. §§ 4.20(a)(1) and (b), 4.21(a)(1) and (b) and 4.22 (2010);

2.   trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(29) of the CEA, 7 U.S.C. § 1a(29)(2006));

3.   entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2010)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the CEA as amended by the CRA, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

4.   having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

5.   controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

6.   soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

7.   applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the

Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010);

8.  acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2010)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010).

c)    an order directing Defendants to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the CEA or Regulations, as described herein, and interest thereon from the date of such violations;

d)    an order directing Defendants to make full restitution to every investor who was defrauded by Defendants as a result of acts and practices which constituted violations of the CEA and Regulations, described herein, and interest thereon from the date of such violations;

e)    an order directing Defendants to pay a civil monetary penalty in the amount of not more than the higher of $130,000 for each violation of the CEA or Regulations between October 23, 2004 and October 22, 2008 and $140,000 for each violation of the CEA or Regulations on or after October 23, 2008 or triple the monetary gain to the Defendants plus post-judgment interest; and

f)    such other and further remedial ancillary relief as the Court may deem appropriate.

Dated: January 24, 2011

ATTORNEYS FOR THE PLAINTIFF
U.S. COMMODITY FUTURES
TRADING COMMISSION

Kevin S. Webb
*kwebb@cftc.gov*
James H. Holl, III
*jholl@cftc.gov*
Gretchen L. Lowe
*glowe@cftc.gov*
U.S. Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581
Tel. (202) 418-5000

31